# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

MERCK & CO., INC.,

    Plaintiff,

  v.

BAYER AG,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 2021-0838-NAC

## MEMORANDUM OPINION

Date Submitted: December 19, 2022
Date Decided: April 3, 2023

James D. Taylor, Jr., SAUL EWING LLP, Wilmington, Delaware; Amy S. Kline, SAUL EWING LLP, Philadelphia, Pennsylvania; Joseph D. Lipchitz, SAUL EWING LLP, Boston, Massachusetts; *Counsel for Plaintiff Merck & Co., Inc.*

Rudolf Koch, Kyle H. Lachmund, Kevin M. Kidwell, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Dustin F. Guzior, Y. Carson Zhou, SULLIVAN & CROMWELL LLP, New York, New York; *Counsel for Defendant Bayer AG.*

**COOK, V.C.**

This litigation arises from the disputed interpretation of a Stock and Asset Purchase Agreement ("SAPA") between Plaintiff Merck & Co., Inc. ("Merck") and Defendant Bayer AG ("Bayer"). Merck and Bayer are two of the largest pharmaceutical companies in the world. In 2014, Merck and Bayer entered the SAPA pursuant to which Bayer purchased Merck's Claritin, Coppertone, and Dr. Scholl's product lines. Bayer paid Merck more than $14 billion in cash for these product lines.

After the transaction closed, both Merck and Bayer were the subject of lawsuits alleging injuries arising from consumers' use of talc-based products. These product liability claims concern talcum powder or "talc" that Merck used in certain foot powder product lines sold to Bayer. The lawsuits claim that asbestos allegedly contained in talcum powder has caused fatal cancers. As a result of these lawsuits, producers of talcum products potentially face billions of dollars of liability, in the form of both litigation costs defending such claims and in payouts to consumers.

Merck and Bayer, as sophisticated participants in the pharmaceutical industry, understood that consumer products businesses face potential liability for torts associated with the sale of such consumer products. The acquiror of a large consumer products business has two distinct concerns regarding potential product liability claims filed *after* a transaction's closing but related to products sold *before* the closing. The first is the allocation between the buyer and seller of substantive

liability to third-party consumers, including judgments and settlements. The second is costs that the acquiror may incur, as the new owner of the business, with being involved in product liability lawsuits, even though any liability to the third-party consumer that brought the suit was allocated to the seller.

As discussed in detail below, the SAPA clearly and unambiguously provides that Merck indefinitely retained substantive liability for the product liability claims related to products sold prior to the closing of the transaction. While Merck attempts to argue that its liability for the product liability claims ceased on October 1, 2021, this interpretation is contrary to the clear and unambiguous terms of the SAPA.

Considering Bayer's interpretation of the SAPA is the only reasonable one, this Memorandum Opinion grants Bayer's motion to dismiss Merck's complaint.

## I.     FACTUAL BACKGROUND[1]

On May 5, 2014, Merck and Bayer entered the SAPA whereby Merck would sell, and Bayer would purchase, Merck's consumer care business and consumer care

---

[1] I draw the relevant facts from the Verified Amended Complaint (the "Amended Complaint"). *Merck & Co., Inc. v. Bayer AG*, C.A. No. 2021-0838-NAC, Docket ("Dkt.") 2 ("Amended Compl."). In addition, copies of the SAPA, relevant sections of the Merck disclosure schedule, and the assumption agreement were attached as Exhibits A, B, and C, respectively, to Bayer's Opening Brief in Support of its Motion to Dismiss. Dkt. 17 ("Bayer's OB"). The SAPA, disclosure schedule, and assumption agreement are incorporated by reference into the amended complaint. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

product lines, including the Dr. Scholl's and Lotrimin foot powder product lines. The transaction closed on October 1, 2014 (the "Closing Date").

The SAPA includes liability and indemnification provisions addressing each party's responsibility for, among other things, consumer tort litigation and claims alleging injury relating to advertising of products or arising from consumer protection laws (the "Product Claims"). Both Merck and Bayer have been the subject of lawsuits alleging injuries arising from consumers' use of talc-based products, including products from the Dr. Scholl's product line. Merck asserts that its liability for Product Claims related to products sold prior to the Closing Date was time-limited and transferred to Bayer on October 1, 2021.

Since the Closing Date, Bayer has tendered Product Claims to Merck pursuant to Section 2.7(d) of the SAPA. Merck has conditionally accepted Bayer's tenders of Products Claims, while reserving all its rights. Merck has been defending the Product Claims tendered by Bayer and has paid the defense and liability costs associated with such Product Claims. Bayer did not participate in defending these Product Claims.

On January 4, 2021, Merck sent a letter to Bayer advising Bayer that "Merck will cease accepting tenders from Bayer of all product-related claims, including but not limited to all Product Claims, under Section 2.7(d) as of 5:00 p.m. (Eastern

3

Daylight Time) on October 1, 2021[.]"[2] Between January and September 2021, Merck and Bayer engaged in conversations regarding the potential transition of responsibility for, and coordination of the defense of, the Product Claims from Merck to Bayer. On September 15, 2021, Bayer asserted that Merck's liability for the Product Claims would not sunset; consequently, discussions regarding the transfer of liabilities broke down.

Merck sued Bayer on September 30, 2021, bringing claims for injunctive relief, specific performance, declaratory judgment, and breach of contract. All of Merck's claims are predicated on Bayer's alleged breach of the SAPA by refusing to assume liability for the Product Claims. The specific provisions of the SAPA relevant to Merck's claims are Articles II and X.

Article II of the SAPA contains two sections apportioning liability among the parties. Section 2.6 provides as follows:

> 2.6. <u>Assumption of Liabilities</u>. Effective as of the Closing, neither Seller nor any of its Affiliates shall have any liability or obligation with respect to, and Buyer shall assume and thereafter pay, perform and discharge when due, all liabilities and obligations of Seller and its Affiliates, whether relating to periods prior to, on, or after the Closing, to the extent related to or arising from, the Transferred Consumer Care Assets, the Consumer Care Business, the Transferred Rx Product Assets, the Rx Product Business and/or the Conveyed Sites, other than the Retained Liabilities (collectively, the "Assumed Liabilities") (provided that, notwithstanding anything to the contrary in this Section 2.6, (i) any liabilities or obligations of the Companies or any of their Subsidiaries shall not constitute Assumed Liabilities, it being

---

[2] Amended Compl. ¶ 27.

4

acknowledged and agreed that such liabilities or obligations (other than Retained Liabilities) shall remain the liabilities or obligations, as applicable, of the Companies or their applicable Subsidiaries immediately after the Closing, and (ii) nothing in this Section 2.6 shall affect Buyer's rights pursuant to Article X), including, without limitation: . . . (e) any obligations or liabilities to the extent relating to the Consumer Care Business in connection with any Litigation, other than Retained Liabilities; . . . and (h) the obligations and liabilities set forth in Section 2.6(h) of the Seller Disclosure Schedule.[3]

In layman's terms, Bayer agreed to assume liability for all business lines acquired from Merck other than the "Retained Liabilities." Section 2.7 sets forth the liabilities retained by Merck:

> 2.7. <u>Retained Liabilities</u>. Seller shall, without any further responsibility or liability of, or recourse to, Buyer, or any of Buyer's directors, shareholders, officers, employees, agents, consultants, representatives, Affiliates, successors or assigns (including the Companies and their Subsidiaries), absolutely and irrevocably assume and be solely liable and responsible for the following obligations and liabilities (the "Retained Liabilities"); it being understood that nothing in this Section 2.7 shall affect Buyer's rights pursuant to Article X: (a) all obligations and liabilities to the extent relating to or arising out of the Retained Assets; (b) any Taxes for which Seller is responsible under Section 6.1 of this Agreement; (c) all obligations and liabilities for which Seller or its Affiliates are made responsible pursuant to the terms of this Agreement or the Ancillary Documents; (d) the obligations and liabilities set forth in Section 2.7(d) of the Seller Disclosure Schedule (the "Section 2.7(d) Liabilities"); and (e) the China Obligations.[4]

Section 2.7(d) of the Seller Disclosure Schedule includes as "Retained Liabilities" the following items:

---

[3] Bayer's OB, Ex. A ("SAPA") § 2.6. Merck is defined as the "Seller" and Bayer is defined as the "Buyer" under the SAPA.

[4] *Id.* § 2.7.

1. Any product liability or similar claim for injury to a Person or property that allegedly arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by the Transferred Business, Seller or its Affiliates, or any of the Companies or their Subsidiaries, or by reason of the alleged improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured, marketed or sold by the Companies or their Subsidiaries or otherwise in connection with the Transferred Business, in each case to the extent arising out of or relating to periods prior to the Closing.

2. Any liability or obligation of the Transferred Business, Seller or any of its Affiliates, or any of the Companies or their Subsidiaries, which is related to or associated with the failure, alleged failure or purported failure of a product to comply with applicable labeling, false or misleading advertising or consumer protection Laws, including California's Proposition 65 (California Health & Safety Code Section 25249.6 et. seq.), in each case to the extent arising out of or relating to periods prior to the Closing.[5]

In sum, pursuant to Section 2.7, Merck "absolutely and irrevocably" retained "all obligations and liabilities" for product liability claims related to the product lines acquired by Bayer, including the Dr. Scholl's product line, to the extent such claims arise out of or relate to periods prior to the Closing Date.

Article X contains the relevant provisions governing indemnification and survivability. Section 10.1 provides as follows:

> 10.1. Expiration of Representations and Warranties; Indemnification Obligations. All of the representations and warranties of the parties set forth in this Agreement shall terminate and expire, and shall cease to be of any force or effect, at 5:00 P.M. (Eastern time) on the date that is the twelve (12) month anniversary of the Closing Date . . . and, in each case, all liability and

---

[5] Bayer's OB, Ex. B ("Section 2.7(d) Seller Disclosure Schedule") ¶ 1–2. The Section 2.7(d) Seller Disclosure Schedule contains a third item that it is not at issue in this matter.

indemnification obligations with respect to such representations and warranties shall thereupon be extinguished (except to the extent a claim for indemnification has been validly made prior to such time for any breach thereof). All liability and indemnification obligations with respect to the Section 2.7(d) Liabilities shall survive until 5:00 P.M. (Eastern time) on the date that is the seventh (7th) anniversary of the Closing Date (except that all liability and indemnification obligations with respect to the third item set forth in Section 2.7(d) of the Seller Disclosure Schedule shall survive until 5:00 P.M. (Eastern time) on the date that is the tenth (10th) anniversary of the Closing Date), in each case except to the extent a claim for indemnification has been validly made prior to such time.[6]

Section 10.2 provides as follows:

> 10.2. <u>Indemnification</u>.
>
> Except with respect to indemnification for Taxes, which is governed exclusively by Article VI (other than indemnification for Losses in respect of Taxes arising out of the failure of the representations made by Seller in Section 3.17(d), (f), (g) and (h) of this Agreement to be true, complete and accurate as of the Closing Date, which indemnification is governed exclusively by this Section 10.2): . . .
>
> (b) <u>By Seller</u>. From and after the Closing, Seller agrees to indemnify, defend and hold harmless Buyer, its Affiliates (including, for the avoidance of doubt, each Company and any Subsidiary of a Company), and their respective officers, directors, employees, members, partners, agents, representatives, successors and assigns (collectively, "Buyer Indemnitees") from and against all Losses[7] imposed on, incurred by or asserted against any of Buyer

---

[6] SAPA § 10.1.

[7] "Losses" is defined in the SAPA to mean "all claims, losses, liabilities, damages, actions, suits, proceedings, payments, judgments, settlements, assessments, deficiencies, interest, penalties, costs and expenses, including, without limitation, removal costs, remediation costs, closure costs, fines, expenses of investigation and ongoing monitoring, reasonable attorneys' fees and disbursements, <u>provided</u>, that (i) Losses shall not include punitive damages unless such Loss is payable by an Indemnitee to a third party in connection with any third party claim relating to any matter for which such Indemnitee is entitled to indemnification hereunder, (ii) for purposes of computing Losses imposed on, incurred by or asserted against an Indemnitee, there shall be deducted an amount equal to the amount

Indemnitees arising out of or relating to: (i) the failure of any representation or warranty made by Seller in this Agreement . . . to be true, complete and accurate as of the Closing Date, (ii) any breach of any covenant or agreement of Seller contained in this Agreement, (iii) the Retained Assets and/or the Retained Liabilities (other than Section 2.7(d) Liabilities), (iv) the Section 2.7(d) Liabilities or (v) the failure of any representation or warranty made by Seller in Sections 3.10(b) and (c) (Sufficiency of Transferred Assets) to be true, complete and accurate as of the Closing Date.

. . .

(f) <u>Exclusive Remedies Following the Closing Date</u>. Following the Closing Date, except for claims based on fraud against the party allegedly committing the fraud, the indemnification provisions of this Article X shall be the sole and exclusive remedy of the Indemnitees, whether in contract, tort or otherwise, for all matters arising under or in connection with this Agreement and the Contemplated Transactions, including, without limitation, for any inaccuracy or breach of any representation, warranty, covenant or agreement set forth herein and with respect to any matters or claims arising under Environmental Laws, and Buyer and its successors and assigns hereby waive, and unconditionally release Seller and its Affiliates from, any rights and remedies that Buyer and its successors and assigns may otherwise have against Seller or any of its Affiliates under any Environmental Law, including, without limitation, any claims for contribution under CERCLA or common law. Notwithstanding the foregoing, the parties shall also be entitled to all rights and remedies under Article VI and Sections 12.15 and 12.16.[8]

---

of any insurance proceeds, indemnification payments, contribution payments and reimbursements, and Tax benefits, actually received by such Indemnitee or any of such Indemnitee's Affiliates in connection with such Losses or the circumstances giving rise thereto and (iii) any Losses in the nature of 'lost revenues' or 'lost profits' incurred by an Indemnitee shall be calculated only as an amount corresponding dollar-for-dollar to the actual amount of lost revenues or lost profits, not a multiple of such lost revenues or lost profits." *Id.* § 1.1.

[8] *Id.* § 10.2. Article VI addresses tax matters. *Id.* Art. VI. Section 12.15 provides, in part, that "each party shall be entitled to enforce the terms of this Agreement by a decree of specific performance[.]" *Id.* § 12.15. Finally, Section 12.16 sets forth terms regarding "Local Agreements" (*e.g.*, bills of sale, assignment and assumption agreements, and similar

In sum, this broad and complex provision governs the indemnification rights of each of Merck and Bayer.

Bayer has moved to dismiss the action under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[9] A hearing on Bayer's motion to dismiss was held on December 19, 2022.

## II. ANALYSIS

The dispute between the parties concerns an interpretation of the contractual language in the SAPA and related documents. Both Bayer and Merck agree that the SAPA is unambiguous, though the parties disagree as to the proper interpretation of the SAPA. Merck contends that all Section 2.7(d) Liabilities transferred from Merck to Bayer on October 1, 2021, based on language included in Section 10.1. In contrast, Bayer argues that the language of Sections 2.6 and 2.7 unambiguously provides that Merck retains the Section 2.7(d) Liabilities forever and that the language Merck relies upon in Section 10.1 deals with separate indemnification rights.

As set forth below, the interpretation offered by Bayer is the only reasonable one, and, therefore, Merck's complaint must be dismissed.

---

instruments) that the parties agreed to enter to transfer title to certain stock and assets. *Id.* §§ 1.1, 12.16.

[9] Dkt. 6 ("Mot. to Dismiss").

## A. Legal Standard

In considering Bayer's motion to dismiss under Rule 12(b)(6), the standard is well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[10]

"Under Delaware law, the proper interpretation of language in a contract is a question of law. Accordingly, a motion to dismiss is a proper framework for determining the meaning of contract language."[11] Dismissal of a contract dispute under Rule 12(b)(6) is proper, however, "only if the defendants' interpretation is the only reasonable construction as a matter of law."[12]

"When the contract is clear and unambiguous, [this Court] will give effect to the plain meaning of the contract's terms and provisions."[13] This Court interprets contracts "as a whole and [gives] each provision and term effect, so as not to render

---

[10] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (quotations omitted).

[11] *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 581 (Del. Ch. 2006).

[12] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (emphasis omitted); *see Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996) ("On a motion to dismiss for failure to state a claim, a trial court cannot choose between two differing reasonable interpretations of ambiguous documents.") (citation omitted).

[13] *Osborn v. Kemp*, 991 A.2d 1153, 1159–60 (Del. 2010).

any part of the contract mere surplusage[.]"[14]  A contract will not be read "to render a provision or term meaningless or illusory."[15]  "As a matter of black letter law, 'all writings that are part of the same transaction are interpreted together.'"[16]

It is appropriate at the motion to dismiss stage to consider the commercial reasonableness of an interpretation offered by a party.  Where an agreement is unambiguous, it should be "read in full and situated in the commercial context between the parties."[17]  As our Supreme Court has stated, "interpretations that are commercially unreasonable or that produce absurd results must be rejected."[18]

---

[14] *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56 (Del. 2019) (quoting *Osborn*, 991 A.2d at 1159).

[15] *Id.* (quoting *Osborn*, 991 A.2d at 1159).

[16] *Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1081 (Del. Ch. 2021) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 202(2)).

[17] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017).

[18] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1211 (Del. 2021); *see Osborn*, 991 A.2d at 1160 (Courts should reject "an unreasonable interpretation [that] produces an absurd result or one that no reasonable person would have accepted when entering the contract"); *see also IMO Ronald J. Mount 2012 Irrevocable Dynasty Trust U/A/D Dec. 5, 2012*, 2017 WL 4082886, at *4 (Del. Ch. Sept. 7, 2017) ("[M]y task is to construe the contract according to the plain meaning of its terms, remaining mindful that my construction of each term must make sense when considering the contract as a whole.") (citing *Riverbend Cmty., LLC v. Green Stone Eng'g, LLC*, 55 A.3d 330, 334-35 (Del. 2012)).

**B.** **The SAPA Allocated Liabilities In A Clear And Unambiguous Manner**

As noted, the SAPA dealt with two distinct forms of liability. The first is potential substantive liability to third-party consumers, including judgments and settlements.[19] The second is costs incidental to litigation—even if Bayer is not liable to the third-party consumer that brought the suit.[20] With respect to the Product Claims, it is clear that Sections 2.6 and 2.7 deal with the first category of liabilities while Article X provides a separate and distinct right to contractual indemnification, including for losses Bayer might suffer that arise out of or relate to the Section 2.7(d) Liabilities that Merck retained.

The parties allocated the risk of substantive liability for Product Claims in Sections 2.6 and 2.7 of the SAPA. In Section 2.6, Bayer agreed to assume all liabilities other than specified Retained Liabilities.[21] These Retained Liabilities were expressly laid out in Section 2.7, wherein Merck agreed to retain liability regarding Product Claims for products sold before the Closing Date but for which lawsuits are brought after the Closing Date.[22] The language in Section 2.7 is broad and unambiguous:

---

[19] *See* Dkt. 33 ("Hr'g Tr.") at 7.

[20] *Id.*

[21] SAPA § 2.6.

[22] *Id.* § 2.7

12

[Merck] shall, *without any further responsibility or liability of, or recourse to, [Bayer] . . . absolutely and irrevocably assume and be solely liable and responsible for* the following obligations and liabilities (the "Retained Liabilities"); it being understood that nothing in this Section 2.7 shall affect [Bayer's] rights pursuant to Article X: . . . Any product liability or similar claim for injury to a Person or property that allegedly arises out of . . . the Transferred Business . . . in each case to the extent arising out of or relating to periods prior to the Closing.[23]

Merck contends that the parties would have used words like "perpetual" or "forever" if Merck had in fact agreed to retain the Section 2.7(d) Liabilities indefinitely.[24] But the words used by the parties establish exactly this form of agreement. Turning to Black's Law Dictionary, both "absolute" and "irrevocable" encompass the idea of unreserved commitment.[25] This unambiguous language establishes Merck's obligation to retain liability for Product Claims associated with talc products sold prior to the Closing Date indefinitely. I could arguably end my

---

[23] *Id.* This version of Section 2.7(d) has been modified for clarity, with emphasis added. The portion before the colon is from the SAPA. The portion after the colon is from Section 2.7(d) of the disclosure schedule. *See* Section 2.7(d) Seller Disclosure Schedule ¶ 1. The unmodified version of Section 2.7(d) and the relevant language from the disclosure schedule is set forth in Section I.

[24] Amended Compl. ¶ 21 Merck also argues that I should view its "absolute[] and irrevocabl[e]" assumption in Section 2.7(d) as just meaning that it "absolutely and irrevocably" assumes only those Product Claims tendered to it by Bayer. Dkt. 19 ("Merck's AB") at 20. However, this interpretation is not supported by the plain language of Section 2.7, which makes no distinction as to Product Claims tendered to Merck.

[25] *Absolute*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Free from restriction, qualification, or condition; Conclusive and not liable to revision."); *Irrevocable*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Unalterable; committed beyond recall."). *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract.").

analysis here, but further reasons compel this Court to conclude that Bayer's interpretation is the only reasonable one.

### C. Merck's Attempt To Shoehorn The Indemnification Provision's Sunset Into Section 2.7 Fails As A Matter Of Law

Merck argues that Section 10.1 must be read as imposing a time limit on Merck's obligations under Section 2.7 to defend the Product Claims relating to products sold prior to the Closing Date.[26] Per Merck, a failure to interpret the SAPA in this manner would contradict the principle that contracts be "read as a whole, giving meaning to each term."[27] But a plain reading of Article X of the SAPA clearly establishes that Merck's interpretation is incorrect.

While substantive third-party liability was apportioned in Sections 2.6 and 2.7, Article X addresses the separate and distinct issue of various, limited contractual indemnification rights belonging to Merck and Bayer vis-à-vis each other. In addition, Article X sets forth time limits on these contractual indemnification rights, as well as the SAPA's representations and warranties.[28] What Article X does not do is extinguish the underlying liability for third-party claims. Indeed, Article X *cannot*

---

[26] Merck's AB at 17–19.

[27] Merck's AB at 18 (quoting *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 846 (Del. 2019)).

[28] *See SPay, Inc. v. Stack Media Inc.*, 2021 WL 6053869, at *5–7 (Del. Ch. Dec. 21, 2021) (discussing contractual terms used to deviate the survival period of certain representations and warranties from the three-year statutory limitations period)

do this, since it addresses purely contractual rights between Merck and Bayer and has no bearing on the tort claims of third-party consumers who are not party to the SAPA.

Under Section 10.2, Merck agreed to "indemnify, defend and hold harmless [Bayer] . . . from and against all Losses imposed on, incurred by or asserted against [Bayer] arising out of or relating to: . . . (iv) the Section 2.7(d) Liabilities[.]"[29] Section 10.2 contained similar obligations undertaken by Merck to "indemnify, defend and hold harmless [Bayer]" for the failure of any representation to be true, complete, and accurate and for any breach of any covenant or agreement made by Merck in the SAPA.[30]

Section 10.1 ("Expiration of Representations and Warranties; Indemnification Obligations") discusses the survival of these obligations:

> All of the representations and warranties of the parties set forth in this Agreement shall terminate and expire, and shall cease to be of any force or effect, at 5:00 P.M. (Eastern time) on the date that is the twelve (12) month anniversary of the Closing Date . . . and, in each case, *all liability and indemnification obligations with respect to such representations and warranties* shall thereupon be extinguished (*except to the extent a claim for indemnification has been validly made* prior to such time for any breach thereof). *All liability and indemnification obligations with respect to the Section 2.7(d) Liabilities* shall survive until 5:00 P.M. (Eastern time) on the date that is the seventh (7th) anniversary of the Closing Date . . . in each case

---

[29] SAPA § 10.2(b).

[30] *Id.*

*except to the extent a claim for indemnification has been validly made* prior to such time.[31]

Merck rests its case entirely on the presence of the phrase "all liability" in Section 10.1. Per Merck, the definitions of "all" and "liability" are broad.[32] Merck asserts that the inclusion of "liability" contrasted with the word "indemnification" unambiguously demonstrates the parties' intent to sunset Merck's obligations as to the Retained Liabilities on the seventh anniversary of the Closing Date and transfer them entirely to Bayer.[33] Merck argues that a contrary reading would render the term "liability" superfluous.[34] This is a red herring.

Merck's argument fails, as its interpretation would result in "an implausibly circuitous and tortured means of implementing" the SAPA.[35] Considering the SAPA as a whole, there is no circumstance in which it is reasonable to read Section 10.1's reference to "liability" in Merck's favor.[36]

---

[31] *Id.* § 10.1 (emphasis added).

[32] Merck's AB at 21–22 (citing *Lorillard Tobacco*, 903 A.2d at 738).

[33] *Id.* at 21–23.

[34] *Id.* at 17–19. At oral argument, Bayer's counsel offered that, while giving independent meaning to Section 10.1's reference to "liability" is unnecessary to grant Bayer's motion, its inclusion is directed to the foreclosure of certain arguments based on common law. Hr'g Tr. at 63-64.

[35] *White v. Curo Tex. Hldgs., LLC*, 2017 WL 1369332, at *15 (Del. Ch. Feb. 21, 2017).

[36] The phrase "all liability and indemnification obligations" appears more than once in Section 10.1. As Bayer's counsel noted at oral argument, Merck's position would impose materially different meanings on the first and second appearances of the phrase despite their being used in near-immediate succession in Section 10.1. Hr'g Tr. at 30–31.

Indeed, if I were to adopt Merck's advocated interpretation of Section 10.1, that approach would lead, at most, only to the absurd conclusion that, after seven years, the pool of Section 2.7(d) Liabilities retained by Merck simply "expires." Merck avers that upon this "expiration" the Section 2.7(d) Liabilities become Bayer's, but there is no mechanism in the SAPA by which these liabilities would be transferred upon expiration. And it does not make sense to say that the third-party tort claims that comprise the Section 2.7(d) Liabilities would "expire" after seven years. As highlighted by Bayer, Merck and Bayer have no power to extinguish liability for the Product Claims, which are tort claims brought by third parties that were not parties to the SAPA.[37] The fact that Merck and Bayer agreed to an expiration of mutually agreed contractual liabilities in Article X has no bearing on the allocation of third-party tort liability set forth in Section 2.7.

Furthermore, and contrary to Merck's assertions, it is not reasonable to read a single word in Section 10.1 as unwinding the thoroughly assigned liabilities within Sections 2.6 and 2.7. Nowhere in Sections 2.6 or 2.7 is there language supporting Merck's claim that the inclusion of the word "liability" in the SAPA's indemnification provision was intended to negate the parties' careful allocation of

---

[37] *See* Bayer's OB at 26–27.

liability for Product Claims. Rather, Section 2.7 specifically provides that it concerns rights separate from Bayer's indemnification rights under Article X.[38]

Had the parties intended to impose the time limits set forth in Section 10.1 on the Section 2.7(d) Liabilities, then one would expect explicit language to that effect. Instead, the parties expressly stated that "nothing in this Section 2.7 shall affect [Bayer's] rights pursuant to Article X."[39] As this Court has stated, "to express or include one thing implies the exclusion of the other."[40] That the parties explicitly reference Article X in Section 2.7 without stating that the time limits in Section 10.1 are applicable to Section 2.7 provides further clear evidence that these provisions deal with wholly separate issues. The "circuitous and tortured" implied time limit that Merck urges contradicts the SAPA's plain meaning and must be rejected.

In addition, Section 10.2(f) states that "the indemnification provisions of this Article X shall be the sole and exclusive remedy" of the parties.[41] The plain text of this provision is yet further confirmation that the provisions of Article X are directed

---

[38] *See* SAPA §§ 2.6, 2.7; Section 2.7 states "nothing in this Section 2.7 shall affect Buyer's rights pursuant to Article X[.]" *Id.* § 2.7.

[39] *Id.* § 2.7.

[40] *Fortis Advisors LLC v. Shire US Hldgs., Inc.*, 2017 WL 3420751, at \*8 (Del. Ch. Aug. 9, 2017).

[41] Quite notably, while Article X places time limits on various indemnification rights found in that portion of the SAPA, the parties' rights to specific performance of the SAPA are found elsewhere, in Section 12.15, and are expressly carved-out from Section 10.2(f)'s exclusive remedies. As Bayer thus states, its right to obtain specific performance of Merck's retention of Section 2.7(d) Liabilities remains on-going. Bayer's OB at 32–33.

18

to questions of contractual indemnification and, in no event, effectuate an absurd, one-word transfer of Section 2.7(d) Liabilities from Merck to Bayer.

## D. Case Law Further Supports Bayer's Interpretation

Bayer's interpretation is bolstered by case law, and Merck's attempts to distinguish this relevant precedent fail. In seeking dismissal, Bayer points to *JFE Steel Corp. v. ICI Americas, Inc.* In *JFE Steel*, the U.S. District Court for the District of Delaware addressed which party to an asset purchase agreement was responsible for certain environmental clean-up costs associated with land sold under the agreement.[42] The seller under the agreement argued that the time limit on indemnification meant that it "would retain liability for pre-closing environmental liabilities for a period of ten years[.]"[43] The *JFE Steel* court rejected the seller's argument because it confused two distinct provisions of the agreement.[44] One provision provided that indemnification obligations would survive for ten years, while another provision provided that the seller would retain certain liabilities indefinitely, including liabilities associated with environmental cleanup.[45]

---

[42] *JFE Steel Corp. v. ICI Ams., Inc.*, 797 F.Supp.2d 452, 455–57 (D. Del. 2011).

[43] *Id.* at 460.

[44] *Id.* at 470.

[45] *Id.*

Accordingly, the court enforced the seller's agreement regarding the retained liabilities.[46]

Bayer asserts that this case is applicable because, in Section 2.7, Merck agreed to be solely liable for specified Retained Liabilities indefinitely, and this duty is separate and in addition to Merck's obligations found in Article X.[47] Merck attempts to distinguish this case by contrasting the language of the agreements.[48] Merck argues that the agreement in *JFE Steel* provided only for the expiration of "indemnification" while the SAPA provided for the expiration of "all liability and indemnification obligations."[49] As discussed above, this distinction is not meaningful—the language "all liability" in Section 10.1 was meant to cover all contractual obligations created by Article X rather than reapportion liabilities allocated in Sections 2.6 and 2.7.

Bayer likewise relies on applicable persuasive precedent found in *Alexander & Baldwin, Inc. v. C&H Sugar Co., Inc.*[50] In that role-reversed situation, the buyer agreed to assume certain liabilities indefinitely and to indemnify the seller for these

---

[46] *Id.*

[47] Bayer's OB at 23–24.

[48] Merck's AB at 24–25.

[49] *Id.*

[50] Bayer's OB at 24.

assumed liabilities for a period of two years.[51]  Following the lapse of the buyer's

indemnification obligations, the buyer asserted that its responsibility for the assumed

liabilities had terminated.[52]  The court disagreed with the buyer, finding that the

indemnification obligations were in addition to its duty to "assume, perform, and

timely pay and discharge" the assumed liabilities.[53]

Bayer analogizes *Alexander & Baldwin* to this case, noting that while Merck's

Article X obligations expired on October 1, 2021, the separate duty to "absolutely

and irrevocably assume and be solely liable and responsible for" the Retained

Liabilities has no expiration.[54]  Merck attempts to distinguish this persuasive

analysis by focusing on an entirely separate portion of the court's opinion that is

inapplicable to this present case.[55]  Unsurprisingly, I reject Merck's argument and

note that Merck has not identified any significant distinguishing facts between this

case and *Alexander & Baldwin*.

---

[51] *Alexander & Baldwin, Inc. v. C&H Sugar Co., Inc.*, 2009 WL 10671790, at *2–3 (C.D. Cal. Aug. 3, 2009).

[52] *Id.* at *3.

[53] *Id.* at *4.

[54] Bayer's OB at 25.

[55] *See* Merck's AB at 25 (focusing on the court's 12(b)(6) analysis, which concerned an interpretation of the preposition "as of," and ignoring the court's ripeness analysis, which discussed and rejected the defendant's argument that the time limit in the indemnification provision also time limited the defendant's commitment to assume product liabilities).

21

Accordingly, I agree with Bayer that the holdings in *JFE Steel* and *Alexander & Baldwin* are on-point and applicable: Where a party has agreed to assume or retain certain liabilities indefinitely, it cannot escape its obligations through the expiration of related indemnification obligations.

### E. Merck's Remaining Arguments Concerning Contract Interpretation Fail

Merck attempts to rescue its claims through two alternative arguments. First, Merck argues that the "specific" language in Section 10.1 must control over the "general" language in Section 2.7.[56] Second, Merck argues that extrinsic evidence supports its interpretation and that, to the extent that I find the SAPA ambiguous, the motion to dismiss must be denied.[57] I reject both arguments.

#### 1. The General/Specific Canon Is Inapplicable Because Sections 2.7 And 10.1 Are Not In Conflict

Merck argues that I must apply the canon of contract construction that a contract's specific language controls over the contract's general language.[58] In so arguing, Merck cites to our Supreme Court's opinion in *DCV Holdings, Inc. v. ConAgra, Inc.* for the proposition that "[s]pecific language in a contract controls over general language, and where specific and general provisions conflict, the

---

[56] *Id.* at 20–21.

[57] *Id.* at 30–35.

[58] *Id.* at 20–21.

specific provision ordinarily qualifies the meaning of the general one."[59]  Merck

contends that "the general language of Section 2.7 providing that Merck will retain

Section 2.7(d) Liabilities is qualified by the specific language in Section 10.1 which

provides that Merck will retain said liability only for a period of seven years."[60]

Merck's argument fails.  As established in each of the cases cited by Merck,

the general/specific canon applies only where specific and general provisions

conflict.[61]  As explained above, Section 2.7 and Section 10.1 are not in conflict—

instead, these provisions deal with entirely distinct issues.  In fact, Merck's argument

is undercut by one of the very cases it relies upon, *Kan-Di-Ki, LLC v. Suer*.

In *Kan-Di-Ki*, the plaintiff argued that a longer time limit applicable to the

survival of representations, warranties, covenants, and agreements within an asset

purchase agreement should be applied to that same agreement's non-competition

---

[59] 889 A.2d 954, 961 (Del. 2005).

[60] Merck's AB at 21.

[61] *See, e.g.*, *DCV Hldgs., Inc.*, 889 A.2d at 959–962 (affirming the Superior Court's finding that a general representation by Seller that there were no undisclosed liabilities was in conflict with a more specific representation that the Seller was in compliance with all laws); *Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, 2020 WL 5588671, at *12–13 (Del. Ch. Sept. 18, 2020) (holding that the more specific 15-month indemnification survival period qualified the general 3-year indemnification period); *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *23–25 (Del. Ch. July 22, 2015) (rejecting plaintiff's attempt to apply a general time limit on the survival of representations, warranties, covenants and agreements under an asset purchase agreement to a more specific time limit on the survival of a non-compete provision within that same agreement).

23

provision, which was subject to a shorter survival period.[62]  As noted by Merck, this Court dismissed this argument because the interpretation the plaintiff put forth "artificially put[] [the two sections at issue] in conflict with one another, such that one or the other would contain a meaningless provision."[63]  This is exactly what Merck attempts to do here.  Adopting Merck's interpretation would artificially put Section 2.7 and Section 10.1 in conflict and would render Merck's commitment to retain the Section 2.7(d) Liabilities "absolutely and irrevocably" meaningless.

### 2. The Relevant Provisions Of The SAPA Are Not Ambiguous

Merck agrees with Bayer that the SAPA is unambiguous.[64]  However, Merck contends that "to the extent that there is any ambiguity, the parties' conduct following the formation of the SAPA" supports Merck's interpretation.[65]  To begin, I do not find that the relevant provisions of the SAPA are ambiguous, and "[e]xtrinsic, parol evidence cannot be used to manufacture an ambiguity in a contract that facially has only one reasonable meaning."[66]  Where, as here, the

---

[62] *Kan-Di-Ki, LLC*, 2015 WL 4503210, at *24.

[63] Merck's AB at 21 (citing *Kan-Di-Ki, LLC*, 2015 WL 4503210, at *24).

[64] *See* Bayer's OB at 35 ("The SAPA is unambiguous[.]"); Merck's AB at 35 ("[T]he SAPA is not ambiguous[.]"); Dkt. 21 ("Bayer's RB") at 18 ("[T]he relevant provisions of the SAPA are not ambiguous[.]").  *See also Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012) ("Contract language is not ambiguous merely because the parties dispute what it means.").

[65] Merck's AB at 30–35.

[66] *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007).

24

"contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[67]

But, even if I could consider extrinsic evidence in this context, the extrinsic evidence to which Merck points as potentially illuminating instead reinforces the deficiency of its position. Merck contends that the parties' post-closing conduct supports its interpretation. Merck points to two categories of post-closing conduct. First, Merck highlights its retention of all Product Claims for seven years following the Closing Date.[68] Second, Merck points to its discussions with Bayer between January 2021 and September 2021, where Merck stated its intention to transfer the Product Claims to Bayer.[69] Per Merck, this conduct "confirms the parties' intent that Merck's liability under Section 2.7(d) would sunset on October 1, 2021."[70]

It is illuminating what evidence Merck does not point to—extrinsic evidence regarding the negotiation or drafting of the SAPA. Instead, Merck relies solely on evidence of the parties' actions after the Closing Date. While such overt statements and acts may be relevant in interpreting an ambiguous contract, a primary tenet of the parol evidence rule is that "relevant extrinsic evidence is that which reveals the

---

[67] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)

[68] Merck's AB at 31–33.

[69] *Id.*

[70] *Id.* at 33.

25

parties' intent *at the time they entered into the contract*."[71]  Given this, "backward-looking evidence gathered after the time of contract is not usually helpful."[72]

Even accepting these allegations as true (as I must), and even assuming for the sake of argument that the terms at issue are ambiguous (they are not), the evidence to which Merck points is unlikely to be relevant.  Indeed, it is hard to see how these discussions, which occurred six years after the negotiation of the SAPA, would be helpful in determining the meaning of the provisions at issue.

## F.    The Commercial Context Of The SAPA Supports Bayer's Position

While a plain reading of the SAPA's terms and relevant case law compel dismissal, the SAPA's basic commercial context further reinforces this conclusion. In other words, what the SAPA's unambiguous language suggests, its basic commercial context confirms.  Thus, considering the SAPA's commercial context, and the structure of the transaction, I am further convinced that Bayer's interpretation is the only reasonable one.

### 1.    Merck's Interpretation Is Commercially Unreasonable

As highlighted by Bayer, Merck's interpretation of the SAPA would be commercially unreasonable because it would allow Merck to dump all pending but

---

[71] *Eagle Indus., Inc.*, 702 A.2d at 1233 n.11 (emphasis in original).

[72] *Id.* (citation omitted).

untendered cases involving Product Claims onto Bayer on October 1, 2021.[73] This means that Merck and its counsel could make all strategic decisions in litigating the Product Claims—including whether to settle Product Claims and the terms of such settlement—without input from Bayer.[74] In addition, in this scenario, Merck would be incentivized to stretch out or stall litigation of the Product Claims with the goal of shifting ultimate liability to Bayer.

In response, Merck argues that its interpretation would only shift responsibility for Product Claims related to products sold prior to the Closing Date but brought after October 1, 2021.[75] Merck contends that its interpretation would not have any impact on Product Claims validly tendered by Bayer before October 1, 2021.[76]

Merck may be correct that its interpretation would not require Bayer to take on those Product Claims that have been tendered to Merck and are being actively litigated. Nonetheless, Merck's interpretation would result in a situation whereby Merck could shift all liability for the products it sold prior to the Closing Date to Bayer.[77] Nothing in the SAPA indicates that the parties intended Bayer to assume

---

[73] *See* Bayer's OB at 30–32.

[74] *Id.* at 31.

[75] Merck's AB at 27.

[76] *Id.*

[77] *See* Bayer's RB at 16.

liability for all of Merck's actions for the period during which it formulated, marketed, and sold the products that are now subject to the Product Claims.

Furthermore, and as discussed in greater detail below, the SAPA contains no mechanism by which Bayer would assume the Section 2.7(d) Liabilities after the Closing Date. If the parties had intended for Bayer to assume the Section 2.7(d) Liabilities, then one would expect the SAPA to include mechanisms by which Bayer could, for example, exercise some degree of influence concerning the litigation of the relevant Product Claims. In addition, one would expect the parties to provide for something akin to a "Form of Assumption Agreement" for the Section 2.7(d) Liabilities as they did with respect to the liabilities assumed by Bayer at closing. However, no such mechanisms exist. In light of these considerations, Merck's interpretation is not commercially reasonable.

### 2. The Structure Of The Transaction Supports Bayer's Interpretation

Merck fails to explain how the language in Section 10.1 would transform its Retained Liabilities into Bayer's Assumed Liabilities. Merck claims that Section 10.1 governs the survival of "all liability and indemnification obligations," including liability for Product Claims.[78] However, as a general matter, only parties privy to a

---

[78] Merck's AB at 17–25.

contract can be bound by its terms.[79]  The only "liability and indemnification obligations" that could expire pursuant to the SAPA are those obligations created by the SAPA, namely, the indemnification obligations found in Section 10.2. Conversely, the Retained Liabilities are pre-existing liabilities involving numerous third parties and are merely allocated within the SAPA.  These liabilities cannot be created or extinguished through the SAPA.  Merck thus fails to demonstrate how its Retained Liabilities are extinguished.

Further, even if Merck could demonstrate a means by which its Retained Liabilities are extinguished, it fails to identify how the SAPA effectuated this transfer to Bayer.  According to the SAPA, the initial transfer of liabilities from Merck to Bayer was accomplished through an "Assumption Agreement," which was a required closing deliverable.[80]  Pursuant to the Assumption Agreement, Bayer "assume[d] and agree[d] to pay, perform and discharge when due, without recourse

---

[79] *See Alliance Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.*, 963 A.2d 746, 760 (Del. Ch. 2009) ("Absent unusual circumstances not present here, the ordinary rule is that only the formal parties to a contract are bound by its terms.").  There are, of course, exceptions to this general rule.  *See, e.g.*, *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 57–58 (Del. 2019) (holding that contracts may impose obligations on affiliates of the contracting parties in certain contexts); *Crispo v. Musk*, 2022 WL 6693660, at *3–11 (Del. Ch. Oct. 11, 2022) (discussing when a third-party beneficiary to a contract may be entitled to enforce its rights under that contract); *Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1089–96 (Del. Ch. 2021) (discussing when a non-signatory to a contract may be bound by a forum selection provision contained in the contract).  None of these exceptions are applicable here.

[80] SAPA §§ 8.6, 9.3; Ex. C to Bayer's OB ("Assumption Agreement").

to [Merck], the Assumed Liabilities and the Other Assumed Liabilities."[81] More damning to Merck's argument is the next paragraph:

> [Merck] acknowledge[s] that, except as expressly set forth in the [SAPA], this Assumption Agreement and any Ancillary Document . . . *[Bayer] and its Affiliates are not assuming* or agreeing to pay, perform or discharge . . . *any liability or obligation of Merck or any of its Affiliates other than the Assumed Liabilities* and the Other Assumed Liabilities.[82]

Merck asserts that the language "except as expressly set forth in the [SAPA]" saves its argument.[83]

Merck is incorrect. First, Bayer's assumption of the Section 2.7(d) Liabilities is not "expressly set forth" in the SAPA. As discussed above, only a contorted and fragmented reading of the SAPA could result in the transfer of Retained Liabilities under Section 10.1. Second, accepting Merck's position would seemingly turn the Assumption Agreement into the contractual equivalent of a Rube Goldberg machine. It would be nonsensical for the parties to carefully allocate Retained and Assumed liabilities in Sections 2.6 and 2.7 and draft an Assumption Agreement effecting that allocation only to negate this entire structure through a single word in the indemnification section. Because the structure of the SAPA fails to allow for the extinguishment or transfer of the Retained Liabilities, Merck's position must fail.

---

[81] Assumption Agreement ¶ 1.

[82] *Id.* ¶ 2.

[83] Merck's AB at 20.

In the alternative, Merck argues that Section 5.6 of the SAPA sets forth a procedure for shifting responsibility of the Product Claims.[84] In addition, at the hearing on this motion, Merck argued for the first time that it did not make sense to read Section 10.2(b)(iv) as covering incidental litigation expenses because Section 5.6(c) already covered such costs.[85]

This argument is unpersuasive and highlights Merck's incongruous reading of the SAPA. Section 5.6 requires Bayer to maintain books and records of the acquired businesses for a period of six years.[86] Section 5.6(c) extends a further obligation to Bayer, requiring it to make those records and certain personnel available to Merck "in anticipation of, or preparation for, existing or future litigation with respect to the Transferred Businesses," among other circumstances.[87] Subsection (c) further provides that Merck will reimburse Bayer for the reasonable out-of-pocket costs associated with its Section 5.6 obligations.[88]

A correct reading of Section 5.6(c) illuminates the difference between Merck's Section 5.6(c) rights and obligations and its other rights and obligations under the SAPA. Under Section 5.6(c), Merck is allowed to make certain requests

---

[84] *Id.* At 27–29.

[85] Hr'g Tr. At 72.

[86] SAPA § 5.6.

[87] *Id.* § 5.6(c).

[88] *Id.*

in its litigation efforts, and it is obligated to reimburse Bayer for the costs of complying. Nothing in Section 5.6 can be read as setting forth the procedure for shifting liability for the Product Claims. Furthermore, Section 10.2 deals with costs that Bayer will incur, not in assisting Merck with its litigation, but as a result of having to participate in litigation for Product Claims retained by Merck. Consequently, Merck's argument fails and further highlights Merck's contorted reading of the SAPA.

### 3. Purchase Price Only Included The Assumed Liabilities As Consideration

Looking at the purchase price provision of the SAPA, I am further convinced that Merck's position is untenable. Section 2.8 of the SAPA governs the purchase price of $14.2 billion agreed upon between the parties; this consideration is given by Bayer in exchange for the "Company Common Stock and the Transferred Assets, and the assumption of the Assumed Liabilities."[89] The explicit acknowledgement of the Assumed Liabilities as consideration contrasts with the absence of any mention of Bayer's assumption of the Section 2.7(d) Liabilities. If these sophisticated parties intended for Bayer to eventually assume the Section 2.7(d) Liabilities retained by Merck, one would expect to see that transfer addressed as part

---

[89] SAPA § 2.8(a).

of the consideration as it was with the Assumed Liabilities. This absence further highlights the flaws with Merck's argument.[90]

Accordingly, considering the commercial context, the structure of the transaction, and other provisions of the SAPA, Merck's asserted interpretation of the SAPA must be rejected.

### G. Merck's Other Claims Fail

Merck includes two additional claims that were minimally briefed and are, frankly, somewhat difficult to understand.

First, Merck demands that Bayer reimburse it for losses of $6 million that Merck incurred in connection with litigating the Section 2.7(d) Liabilities.[91] Merck's request is premised on its faulty argument that its obligation to cover the Section 2.7(d) Liabilities is subject to Article X.[92] Merck relies on Section 10.2(c), which provides in relevant part that Merck "shall not be required to indemnify [Bayer] . . . with respect to any claim arising out of or relating to the matters described in Section 10.2(b)(iv), unless and until the aggregate Losses arising out of or relating to such matters exceed $25,000,000 (the 'Section 2.7(d) Liabilities

---

[90] *See also* Bayer's OB at 2 ("Merck's retention of those product liabilities was a critical component of the consideration that Merck provided to Bayer[.]").

[91] Amended Compl. ¶¶ 57–66, Prayer for Relief.

[92] *See* Merck's AB at 36 ("Section 10.2 clearly and unambiguously provides for certain condition's precedent prior to triggering Merck's obligation to cover Section 2.7(d) Liabilities.").

Deductible')[.]"[93] Merck contends that Bayer must reimburse Merck for the $6 million in losses it incurred associated with the Section 2.7(d) Liabilities because these costs did not exceed $25 million.[94]

To begin Merck's claim for reimbursement fails for the reasons already discussed—Merck "absolutely and irrevocably" agreed to "assume and be solely liable and responsible for" the Section 2.7(d) Liabilities "without any further responsibility or liability of, or recourse to, Bayer."[95] Considering the very minimal allegations and arguments offered by Merck, there is no reasonable construction of the SAPA under which Merck is entitled to reimbursement for the losses it incurred in connection with the Section 2.7(d) Liabilities for which it is solely liable.

Indeed, Merck points to no provision in the SAPA that sets forth the means through which such reimbursement would occur. As highlighted by Bayer, "[i]n Sections 10.2(a) and (b) of the SAPA, Merck and Bayer defined indemnification claims that one party could bring against the other but provided *only Bayer* with an indemnification right with respect to Section 2.7(d) Liabilities."[96] Although it is not

---

[93] *Id.* at 36–37 (quoting SAPA § 10.2(c)).

[94] *Id.* at 37–38.

[95] SAPA § 2.7.

[96] Bayer's OB at 34 (emphasis in original). Section 10.2(b) of the SAPA addresses Bayer's indemnification rights and provides that, "[f]rom and after the Closing, [Merck] agrees to indemnify, defend and hold harmless [Bayer] . . . from and against all Losses imposed on, incurred by or asserted against [Bayer] arising out of or relating to: . . . (iv) the Section

easy to discern, Merck appears to ground its argument in some sort of implicit indemnification obligation, but Section 10.2(a) and (b) establish that such an implicit obligation unambiguously does not exist.

Second, in briefest passing, Merck asserts that its alleged failure to cooperate claim was not the subject of Bayer's motion to dismiss.[97] This appears in a footnote in Merck's answering brief, and Merck's counsel noted it briefly at oral argument.[98] Bayer unequivocally moved to dismiss the entirety of Merck's complaint.[99] If Merck intended to preserve this argument, it should have addressed it in a more meaningful way.[100] Even assuming it was not waived, however, Bayer correctly points out that Merck's allegations in support of this claim comprise a handful of legal conclusions.[101] At oral argument, Merck suggested that this claim should

---

2.7(d) Liabilities." SAPA § 10.2(b). Section 10.2(a) of the SAPA addresses Merck's indemnification rights and includes no provision addressing the Section 2.7(d) Liabilities.

[97] *See* Merck's AB at 10 n.1 ("Although Merck believes Bayer's contract interpretation fails and that the Motion to Dismiss should be denied on that basis alone, Merck has separately pled a breach of contract for Bayer's failure to cooperate that does not hinge on that contract interpretation and thus is not subject to the pending Motion to Dismiss.").

[98] *Id.*; Hr'g Tr. at 50:7–51:2.

[99] *See* Mot. to Dismiss; Bayer's OB at 37 ("Merck's Amended Complaint should be dismissed in its entirety with prejudice.").

[100] *See In re Tesla Motors, Inc., S'holder Litig.*, 2018 WL 1560293, at *20 (Del. Ch. Mar. 28, 2018) ("[F]ailure to raise a legal issue in the above-the-line text of a brief generally constitutes waiver of that issue.").

[101] Bayer's RB at 22–23 (citing Amended Compl. ¶¶ 52, 68).

nonetheless be exempted from the application of Rule 15(aaa),[102] but Merck chose

to stand on its complaint and, as such, Rule 15(aaa) applies.[103]

## III.   CONCLUSION

For the foregoing reasons, Bayer's motion to dismiss is GRANTED.

---

[102] *See* Hr'g Tr. at 51:3–10.

[103] *See Braddock v. Zimmerman*, 906 A.2d 776, 783 (Del. 2006).